UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RICHARD A. SPANN-EL,

    Plaintiff,

       v.                        CAUSE NO. 3:20-CV-760-RLM

BENNETT, et al.,

    Defendants.

<u>OPINION AND ORDER</u>

Richard A. Spann-El, a prisoner proceeding without a lawyer, was granted leave to proceed on an Eighth Amendment claim against Captain Michael Fisher, Captain Robert Bennett,[1] Captain Ernest Pickens, Officer Jonathan Cruz, and Officer Christopher Kaylor for failing to protect him from an attack by other inmates at Miami Correctional Facility. The defendants move for summary judgment, arguing that the evidence shows they were not deliberately indifferent to the risk of harm. Mr. Spann-El has responded to the motion, and the time has expired for the defendants to file a reply.[2] The matter is now ripe for adjudication.

*Standard of Review*

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

[1] Mr. Spann-El misspelled this defendant's name as "Bennet" in the complaint. The court uses the correct spelling in his opinion.

[2] Pursuant to N.D. Ind. L.R. 56-1(c), any reply was due by June 21, 2023.

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." Dunn v. Menard, Inc., 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

A party opposing a properly supported summary judgment motion can't just rely on allegations or denials in her own pleading, but rather must "present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). At the summary judgment stage, the court can't "weigh conflicting evidence" or "make credibility determinations," because that's what a jury does. Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704-705 (7th Cir. 2011) (citations omitted). The court's only function is "to determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 657 (2014).

*Background*

These facts are undisputed unless otherwise noted. Mr. Spann-El arrived at MCF from another facility at the end of 2019. Three or four weeks after his arrival, he received a message through another inmate that some guys were looking for him because they believed he owed them $500. Mr. Spann-El attests this was a case of

mistaken identity, and that they had him confused with another "Ricky" who also wore his hair in braids. He ignored the talk at first but in February 2020 he was transferred to cell N-436 in N-Dorm, and his new cell mate, De'maggio Johnson, warned him that the same guys were after him and were planning to have a talk with him." Mr. Spann-El attests that during this period, "anybody in the prison could go into any dorm" due to a lack of security during meal times.

A few days after Mr. Johnson gave him the warning, he was lying on his bed when three inmates he didn't know came into his cell. The inmates, one of whom he thought was called "Big Dave," told him they were there to collect the $500. Mr. Spann-El told him they had him confused with another inmate, but they didn't believe him. They punched and kicked him and then ran from the dorm, telling him they would return the following week. Mr. Spann-El suffered a black eye, a cut on his lip, and other injuries in the attack.

Mr. Spann-El put in a request for protective custody later that day. He was preparing for a court hearing on February 26, and worried about being stabbed "or worse" before his scheduled court date. His request for protective custody didn't include specifics out of concern that it might cause more problems with Big Dave and the other inmates.[3] Mr. Spann-El gave the completed form to Officer Cruz. Officer

---

[3] Mr. Spann-El mainly provided confusing language related to his belief that he is a sovereign citizen. *See, e.g.,* ECF 101-6 at 13 (stating that Mr. Spann-El "is a non-residential foreigner in your jurisdiction under duress, and is seeking protection in return forwarding valuable consideration. The protection is to protect my interest and the obligation to the debt owed to the state.").

Cruz didn't have authority to grant or deny protective custody; instead, he was required to give the form to one of the captains, which he did.

Mr. Spann-El sat in the hallway for a few hours after giving the form to Officer Cruz, and was then escorted back to cell N-436. He became increasingly worried about being attacked and ultimately "suffer[ed] an episode" of anxiety that resulted in him being taken to the medical unit. Mr. Spann-El spoke to some of the nurses and officers (non-parties) in the medical unit about the situation and put in another request for protective custody later that night. This time, he provided specifics about Big Dave and the inmates who had attacked and threatened him. He described the attack and stated that the inmates said they would return <u>Monday</u>! After that request, Mr. Spann-El and his cellmate were isolated in their cell all day. Later that evening, an unknown officer came to the cell and told Mr. Spann-El he wasn't getting protective custody. Mr. Spann-El believes Captain Pickens must have denied his request because he was the night-shift supervisor.

The next morning, on his way to breakfast he decided to go to an unauthorized area so that he would be sent to the segregation unit. It worked, but Mr. Spann-El was released from segregation and sent back to N-Dorm later that day. It was after 5 p.m., sp there was no movement of any inmates for the rest of the day. The next morning, Mr. Spann-El immediately went to the medical unit when inmates were released for breakfast and told an officer there (not a defendant in this case) that he couldn't be in general population. The officer told Mr. Spann-El that he had an "out-to-court pass" to be transported to the Elkhart County jail for his upcoming court

hearing. Mr. Spann-El was transferred to the county jail on February 25 and remained there until February 28. An unsigned inter-departmental memorandum dated February 25 reflects that the prison's Internal Affairs department initiated an investigation in response to Mr. Spann-El's requests for protection, and that a "safety and security move" was approved for him.[4]

Mr. Spann-El arrived back at MCF on February 28. He asked Officer Kaylor where he would be housed, and the officer eventually told him he was going back to N-436. Mr. Spann-El became very "anxious and paranoid" and explained that he could not be put back in population because of the situation with Big Dave. Officer Kaylor called Captain Fisher, who in turn said that Mr. Spann-El should put in a request for protective custody. Officer Kaylor brought Mr. Spann-El a protective custody form and left for the day because his shift ended. Mr. Spann-El turned the completed form in to another officer (not a defendant in this case). Captain Fisher had left for the day and another captain (not a defendant) was on duty during the overnight hours.

Mr. Spann-El appears to have waited in the segregation unit during this period. At some point, an officer told him that he had to return to cell N-436. Mr. Spann-El refused and was written up for "refusing an order." He was then escorted back to N-436. He had a new cellmate at that point; Mr. Johnson had been moved to C-Dorm. Mr. Spann-El attests that Mr. Johnson feared for his life during this period

---

[4] The memorandum is written in the first person, but who wrote it is unclear. Based on the content, it appears to have been authored by a unit team manager or staff member in Internal Affairs.)

because of his proximity to Mr. Spann-El. Mr. Spann-El believes that prison officials likely caused him more problems by moving Mr. Johnson to another dormitory, because it might have appeared that he Mr. Spann-El said something about Mr. Johnson to get him moved. Mr. Spann-El was locked in cell N-436 for two days and had his meals brought to him. During those days, inmates repeatedly came to his cell door, called him a "snitch" and "rat," and told him that he would be stabbed as soon as the doors were opened.

On March 1, 2020, Mr. Spann-El's cell door was opened so that he could go to breakfast. As he walked to breakfast, other inmates attacked, beat, and stabbed him. Mr. Spann-El suffered two broken ribs, blunt force trauma to the head, and permanent damage to an eye, among other injuries.

*Analysis*

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).But "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." Grieveson v. Anderson, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim can't be predicated "merely on knowledge of general risks of violence in a detention facility." Brown v. Budz, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious,

culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." Santiago v. Wells, 599 F.3d 749, 756 (7th Cir. 2010); *see also* Klebanowski v. Sheahan, 540 F.3d 633, 639-40 (7th Cir. 2008) (defendant must have been "actually aware of a substantial harm to [plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger").

The defendants argue that a reasonable jury couldn't conclude that they were deliberately indifferent to Mr. Spann-El's need for protection. The evidence against Officer Cruz reflects that he was given Mr. Spann-El's original protective custody request outlining a vague concern about his safety, and he turned it in to a superior officer. Similarly, Officer Kaylor listened to Mr. Spann-El's concerns when he returned to MCF on February 28, called Captain Fisher, and gave Mr. Spann-El a protective custody form as Captain Fisher directed.[5] Neither of these officers had authority to grant an inmate protective custody or orchestrate a bed move, and the they took the steps within their control to protect him. *See* Bordello v. Allison, 446 F.3d 742, 747 (7th Cir. 2006) (an officer who "responded reasonably to the risk" cannot be held liable, "even if the harm ultimately was not averted" (citation omitted)); Quarles v. Sevier, No. 3:13-CV-843-, 2016 WL 1244026, at *6 (N.D. Ind. Mar. 30, 2016) (concluding that correctional officer without authority to grant a bed move acted reasonably when he alerted his supervisor to the danger). Mr. Spann-El agrees

---

[5] Mr. Spann-El made a vague statement at his deposition about being unsure whether he could trust Officer Kaylor in light of some unspecified events that occurred in the years following this incident. (ECF 108 at 52.) However, "inferences relying on mere speculation or conjecture" are not enough to defeat summary judgment. Trade Fin. Partners, LLC v. AAR Corp., 573 F.3d 401, 407 (7th Cir. 2009).

that these two officers shouldn't be held liable based on their limited involvement in these events, so summary judgment will be granted in their favor.

The three remaining defendants argue that no reasonable jury could conclude that they deliberately ignored a risk to Mr. Spann-El's safety. Their argument hinges on the internal memorandum stating that Internal Affairs was "notified on Tuesday, February 25, 2020," about Mr. Spann-El's concerns and that he was "going to have a safety and security move done on him." (ECF 112 at 6-7; *see also* ECF 101-6 at 9.) In their view, "the undisputed evidence demonstrates that none of the captains ignored his requests for protection and, in fact, a safety and security move was initiated in response to his request." (ECF 112 at 6.)

The court agrees with respect to to Captains Pickens. Mr. Spann-El surmises that Captain Pickens denied his second request for protective custody, but he has no evidence that it was Captain Pickens who denied -- or even considered or was aware of – the request. It's not even clear from the record whether Captain Pickens was on duty the night the request was made. Even if Captain Pickens denied that particular request, the simple denial of a protective custody request doesn't establish deliberate indifference. Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997). Mr. Spann-El's request for protective custody was approved a day or two later, as reflected in the inter-departmental memorandum. There is no evidence Captain Pickens had any involvement after the memorandum was issued or that he had actual knowledge Mr. Spann-El was still in danger. Santiago v. Wells, 599 F.3d at 756; Klebanowski v. Sheahan, 540 F.3d at 639-40. Summary judgment will be granted in his favor.

Summary judgment can't be granted as to the two remaining defendants. Viewing the evidence in the light most favorable to Mr. Spann-El, as the court must at the summary judgment stage, a reasonable jury could conclude that they were deliberately indifferent to the risk of harm posed to Mr. Spann-El. The record reflects Mr. Spann-El was attacked and beaten by inmates on February 23 who threatened to "come back." His first request for protective custody was light on details, but the second one outlined the specifics of the threat posed by Big Dave and the other inmates. As a result, Mr. Spann-El was approved for a "safety and security" bed move on February 25.

Mr. Spann-El attests, and the defendants don't dispute, that it was Captains Bennett and Fisher, the two day shift supervisors in his unit, who were responsible for implementing bed moves. (ECF 114 at 21.) Yet there is evidence they did nothing to execute a bed move for Mr. Spann-El after the approval was made, leaving him in danger. There is also evidence from which a reasonable jury could infer that it wasn't difficult to effectuate a bed move: Mr. Spann-El's cellmate was moved to another dormitory during the few days Mr. Spann-El was out of the facility. As to Captain Fisher, there is additional evidence he had actual knowledge on February 28 that Mr. Spann-El still hadn't been moved and believed himself to be in serious danger. Even though a bed move had already been approved, he told Mr. Spann-El to put in another request for protective custody and took no further steps to help him. Mr. Spann-El was brutally attacked the next morning.

Based on this evidence, a reasonable jury could conclude that Captains Bennett and Fisher violated Mr. Spann-El's Eighth Amendment rights. <u>Sinn v. Lemmon</u>, 911 F.3d 412, 422 (7th Cir. 2018) (reversing summary judgment for defendants where there was evidence they had knowledge of specific risk of harm and "took no responsive action"); <u>Gevas v. McLaughlin</u>, 798 F.3d 475, 481 (7th Cir. 2015) (where there was evidence plaintiff conveyed a "specific, repeated, imminent, and plausible threat to his safety . . . a jury reasonably could infer that they not only had notice of facts from which they could infer that [the plaintiff] faced a serious risk of substantial harm from [another inmate], but that they actually drew this inference, and were thus subjectively aware of the danger he faced."). The claims against these defendants must proceed to trial.

For these reasons, the defendants' motion for summary judgment (ECF 110) is GRANTED in part and DENIED in part. Summary judgment is GRANTED in favor of Captain Ernest Pickens, Officer Jonathan Cruz, and Officer Christopher Kaylor, and DENIED as to Captain Michael Fisher and Captain Robert Bennett.

SO ORDERED on June 27, 2023

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT